## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| MEDIFACTS INTERNATIONAL, INC., | ) | Case No. 07-10110 (PJW) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| MEDIFACTS INTERNATIONAL, INC., | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | Adv. Proceeding No. 07-50973 (PJW) |
| v. | ) |  |
|  | ) |  |
| SANDRA S. GARRETT, and | ) |  |
| BRUCE N. GARRETT, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## AMENDED COMPLAINT

Debtor Medifacts International, Inc. ("Medifacts" or the "Company") as and for its

Amended Complaint against Sandra S. Garrett and Bruce N. Garrett alleges through counsel as

follows:

## PRELIMINARY STATEMENT

1.     This action arises from a lengthy and highly damaging course of self-dealing

committed by Medifacts Director Sandra Garrett, aided and abetted by her husband Bruce

Garrett.  In clear derogation of her duties of loyalty and good faith to Medifacts, Sandra Garrett

repeatedly favored her own financial and personal interest over the interests of the Company.

Among other things, Sandra Garrett refused to recuse herself from meetings of the Board in

which her own and her husband's financial transactions were being addressed; disclosed

confidential Board information to her husband, which he used in negotiations with the Company;

repeatedly threatened to interfere with Board action through "blocking rights" she purported to have under Company documents; and brought baseless and frivolous litigation against the Company in both the Delaware Chancery Court and Bankruptcy Court in an effort to stop transactions that were in the Company's – but not the Garretts' – best interests.  As a result of these and other activities, Medifacts was ultimately unable to sell its Clinical Research Services ("CRO") Division to a ready and willing buyer for $3.9 million; and instead was compelled to sell it, weeks later, to the Garretts for only $2.15 million – a direct loss of $1.75 million.

2.      The Debtor brings this action to recover for its creditors and shareholders the losses it suffered as a result of the Garretts' self-dealing, breaches of fiduciary duty, and aiding and abetting.  In so doing, Medifacts seeks to recover not only the difference in value that it lost in selling the CRO Division to the Garretts, but also the hundreds of thousands of dollars expended in maintaining the CRO Division as part of the Company when – but for the Garretts' actions – it could have been timely and profitably sold.  In addition, Medifacts seeks recovery for the benefit of its creditors for the losses it suffered in its other business – its Corelab Division – which was left with fewer funds to carry out its business, while its growth and profitability were badly hampered by the time, expense and attention that Company management was forced to expend as a result of the Garretts' conduct. Finally, Medifacts seeks to recover for its creditors the vast amount of legal, financial and consulting costs that it was needlessly forced to expend to address and respond to the Garretts' self-dealing schemes.

## PARTIES AND JURISDICTION

3.      Debtor Medifacts International, Inc. ("Medifacts") is a Delaware corporation with a principal place of business in Rockville, Maryland.  Medifacts filed its Petition under Chapter

11 of the Bankruptcy Code on January 28, 2006, and is the debtor-in-possession in this Chapter
11 proceeding.

4.      Defendant Sandra S. Garrett resides in Maryland.  At all relevant times, Sandra
Garrett was a member of the Board of Directors of Medifacts.

5.      Defendant Bruce N. Garrett resides in Maryland.  Until the Garretts' purchase of
the CRO Division, Bruce Garrett was the Chief Medical Officer of Medifacts.

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157, as this is
a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## PROCEDURAL AND FACTUAL BACKGROUND

7.      Medifacts is a privately-held company that provides clinical trial services to
pharmaceutical, biotech, and medical device companies that are developing therapeutic drugs
and products.

8.      At all times relevant, Medifacts had two divisions: (a) the CRO Division, which
provided a range of clinical trial management services to companies involved in Phase I-IV drug
and medical device development; and (b) the Cardiac Safety Services Division ("Corelab"), a
global leader in cardiac safety monitoring services.

### Medifacts' Common and Preferred Stockholders, and The Operative Agreements

9.      Sandra Garrett and Bruce Garrett are both holders of common stock in Medifacts.
The remaining common stock is owned by a number of other individuals.  Other than Sandra
Garrett, no single individual owns more than 6.5% of common stock in Medifacts.

10.     In December 2004, Medifacts was recapitalized through a venture capital funding.
Through this funding, Ampersand 2001 Limited Partnership ("Ampersand") and International

Life Sciences Fund III (LP1), L.P. ("ILS," together with Ampersand, the "Preferred Investors") each came to own 50% of the outstanding Preferred Series A shares in Medifacts.

11.     Medifacts, its common stockholders, and the Preferred Investors are parties to a Stockholders' Agreement dated December 21, 2004 (the "Stockholders' Agreement"). Among other provisions, the Stockholders' Agreement obligates Sandra Garrett to designate two "Common Stock Directors," one of whom is herself and another "who[] shall not be an employee of the Company[.]" Stockholders' Agreement, § 2.1(a)(i). Sandra Garrett also has an affirmative obligation under the Stockholders' Agreement to appoint a new Common Stock Director ("CSD") in the event of a vacancy. See Stockholders' Agreement, § 2.5 ("[t]he parties hereto shall vote and take such other actions as are necessary to ensure that any vacancy in the office of a director shall be filled in accordance with Section 2.1.").

12.     Medifacts and the Preferred Investors – but not the common stockholders – are parties to an Investor Rights Agreement, also entered into on December 21, 2004 which, *inter alia*, governed the Preferred Investors' investment of $16,000,000 in Medifacts. The Investor Rights Agreement contains certain positive and negative covenants through which the Company covenanted with the Preferred Investors that it would not, *inter alia*, take certain material actions without the affirmative vote of at least one CSD and one director designated by the Preferred Investors. Sandra Garrett has repeatedly alleged that these negative covenants permit her to block material corporate actions.

13.     Sandra Garrett executed the Investor Rights Agreement solely in her then-existing capacity as CEO of the Company, and not as an individual or representative of the common stockholders. Neither she nor Bruce Garrett is a party to the Investor Rights Agreement.

## Medifacts' Financial Difficulties

14.      Beginning in October 2005 and continuing through 2006, Medifacts' financial position deteriorated, because both the CRO and Corelab were losing money. During this period, the Board of Directors held meetings, which Sandra Garrett attended, in which Medifacts' financial problems were discussed. In Board meetings in 2005 and early 2006, Sandra Garrett resisted the remaining Board members' calls that she relinquish her role as CEO.

15.      In or about May 2006, certain Board members suggested that Medifacts' financial condition would only improve upon a sale of the CRO Division. A sale of the CRO Division upon favorable terms, including a significant cash component, would serve two important goals: it would provide a much needed cash infusion to support Medifacts' Corelab Division, and lift Medifacts' burden in supporting both the Corelab and CRO Divisions. Thus, the Corelab Division's financial success and, in turn, Medifacts' success, was dependent on a sale of the CRO Division. And without a sale of the CRO Division, both the CRO Division and the Corelab Division would fail. Nevertheless, on this and on numerous later occasions, Sandra Garrett threatened to block any attempt to sell the CRO Division by use of the "blocking rights" she claimed to have under the Investor Rights Agreement.

16.      Sandra Garrett was fully aware of Medifacts' financial crisis during the summer of 2006. In August 2006, for example, Sandra Garrett sent an email to the other members of the Board in which she stated that "Medifacts is no longer in a contemplated turn-around mode. Rather the corporation is in survival mode." Nevertheless, Sandra Garrett resisted all calls to sell the CRO Division despite its drain on the Company's finances.

The Garretts' Scheme to Purchase the CRO at an Artificially Low Price

17.     Beginning at least as early as July 2006, Sandra Garrett and Bruce Garrett concocted a scheme in which Sandra Garrett sought to use her position on the Board to block any attempt to sell the CRO Division to an entity other than one controlled by herself or her husband. In addition, as part of the scheme, Sandra Garrett and Bruce Garrett sought to use Sandra Garrett's position on the Board to compel the Company to sell the CRO Division to them at the lowest possible price.

18.     In furtherance of the scheme, at a September Board meeting, Sandra Garrett again resisted calls to sell the CRO Division, despite the Chief Financial Officer's warning that Medifacts might become insolvent in early 2007. The Board nevertheless decided to seek an investment banker to explore the possibility of such a sale, with the goal of bringing much-needed cash into the Company in order to sustain and grow the remaining Corelab business.

19.     At a meeting held in October 26, 2006, the Board interviewed and selected an investment banker. Sandra Garrett agreed with the selection of the investment banker. At the same meeting, however, Sandra Garrett reiterated her threat to "block" the sale of the CRO Division.

20.     Despite her threat to block any sale of the CRO Division, on October 31, 2006, five days after the meeting, Sandra Garrett sent an email to all Board members indicating that Bruce Garrett would be submitting an offer to purchase the CRO Division. The email also urged the Board to discontinue the investment banker's efforts to find bidders for the CRO Division even though it was essential, as Sandra Garrett knew, for the Company to receive the highest possible cash bid for the continued maintenance and growth of the Corelab Division.

21.     In early November, 2006, Bruce Garrett submitted an offer to purchase the CRO

Division (the "November Offer"). The November Offer proposed a purchase price which

included only the assumption of the CRO's liabilities, and no payment of cash. A short while

later, Bruce Garrett sent a second letter to the Medifacts Board attempting to justify the

November Offer on financial grounds. This second letter relied on confidential information

regarding Medifacts' financial status, including the fact that Medifacts had lost its revolving

credit line, that had been disclosed only at the Board meeting on October 26, 2006, From the

letter, it was evident that Sandra Garrett, who had attended the Board meeting, had disclosed the

confidential information to Bruce Garrett for use in his bid for the CRO Division.

### Sandra Garrett's Refusal To Recuse Herself From Consideration of Bruce Garrett's Bid

22.     Once Bruce Garrett submitted his bid, the other members of the Board requested

that, because of her manifest self-interest in the transaction, Sandra Garrett recuse herself from

any discussions or deliberations of the Board in which Bruce Garrett's bid was to be discussed.

23.     At the first meeting of the Board following Bruce Garrett's bid, Sandra Garrett

briefly recused herself from a discussion involving the bid itself. Thereafter, however – and

during several other meetings of the Board between November 2006 and February 2007 – CEO

Woehler and other Board members repeatedly asked Sandra Garrett to recuse herself, but she

refused. Instead, Sandra Garrett insisted on listening and participating in all Board discussions

and deliberations, regardless of whether Bruce Garrett's or competing bids were being discussed.

As a result, Sandra Garrett was privy to all information presented to the Board concerning the

competing offers for the CRO Division.

The Garretts Improve Their Offer After Learning About Competing Bids

24.     Despite Sandra Garrett's urging that the investment banker cease its efforts to find other bidders for the CRO Division, management of the Company determined that these efforts should continue. As a result of these efforts, in early December, 2006, Medifacts received two confidential offers to purchase the CRO Division: one from Veeda Clinical Research Limited ("Veeda") and the other from Clinical Systems, Inc. ("Clinsys").

25.     Unlike Bruce Garrett's November Offer, the Veeda and Clinsys proposals offered substantial cash payments in addition to the assumption of the CRO Division's liabilities. As a result, both the Veeda and Clinsys proposals were financially superior to the Garretts' offer. Moreover, the substantial cash payments offered by Veeda and Clinsys were essential because they provided Medifacts the funding needed to support its Corelab Division.

26.     In light of the clear superiority of the Veeda and Clinsys bids, management suggested to Bruce Garrett that he improve his bid financially before the deadline for bids expired. Bruce Garrett refused to add any cash to his bid, stating that he would only increase his offer after he had seen the other bids – something he had no right to do. In addition, despite the fact that every bidder was given a deadline to submit bids – a deadline that Veeda and Clinsys adhered to – the Garretts demanded an extension to the deadline and an opportunity for Sandra Garrett to review the competing bids and bid again.

27.     On December 22, 2006, the Board of Directors met to consider the outstanding bids. Despite her clear self-interest, Sandra Garrett refused to recuse herself from the Board's consideration of the bids. Instead, Sandra Garrett demanded that management reveal to her the actual terms of the Veeda and Clinsys bids as they existed at that time. As a result, Sandra Garrett had full knowledge of the Veeda and Clinsys offers and the terms thereof.

28.     During the meeting, the investment banker recommended that the Board accept the bid from Clinsys, which included a cash payment of $3.9 million.  Sandra Garrett objected to the investment banker's recommendation on the purported basis that (1) she had not had time to fully review the bidders' letters of intent and (2) the investment banker should solicit last and final offers from the other two bidders: Veeda and Bruce Garrett.

29.     In part because Sandra Garrett threatened to otherwise "block" a sale to Clinsys through the "blocking rights" she claimed to have in the Investor Rights Agreement, or to otherwise hold up the sale, the Board directed the investment banker to contact Veeda and Bruce Garrett to solicit one last offer.

Sandra Garrett's Effort to Obtain "Veto Power"

30.     A week before the deadline for bids, on or about December 15, 2006, Sandra Garrett had requested that the second Common Stock Director, Susan Pravda, resign from her position.  Acceding to Sandra Garrett's request, Ms. Pravda submitted her resignation to Medifacts' CEO, Michael Woehler, on that date.  Sandra Garrett specifically told CEO Woehler that she had requested that Ms. Pravda resign her position.

31.     Sandra Garrett requested that the second CSD resign because she believed that this would give her "veto power" over material actions of the Board, including the decision to sell the CRO Division to a particular bidder.  Sandra Garrett believed that, because the negative covenants in the Investor Rights Agreement provide for the vote of at least one CSD, she had the power to block any relevant action simply by abstaining or voting no.

32.     From December 15, 2006 through February 2007, members of the Board repeatedly requested that Sandra Garrett designate a second CSD, as she was required to do

under the Shareholders' Agreement. Despite these requests, Sandra Garrett never named a second CSD during this time.

Bruce Garrett Receives Confidential Information and Improves His Bid

33.     Some time shortly after the Board meeting on December 22, 2006, Sandra Garrett disclosed the confidential bid information that she had received during the Board Meeting to Bruce Garrett.

34.     The following day, on December 23, 2006, Bruce Garrett submitted a revised bid for the CRO Division. In the revised bid, Bruce Garrett for the first time offered a substantial cash payment ($2 million) and a promissory note ($1.5 million, payable in six months) to purchase the CRO Division. The promissory note was to be secured by a pledge of Sandra Garrett's common stock in Medifacts. This amount of money for the first time approached the amount that Veeda and Clinsys had offered in their proposals for purchase of the CRO Division.

35.     In addition to the new cash component, the Garretts also expressly committed to close the transaction by January 2, 2007, rather than – as with the Veeda and Clinsys offers – at the end of January; to take the division's assets "as is, where is," rather than after substantial due diligence; and to permit Medifacts to modify certain negative covenants in the Investor Rights Agreement relating to votes by a CSD. In addition, a transaction with the Garretts would eliminate Sandra Garretts' oft-made threat either to "block" or delay any other transaction, or to sue Medifacts if another bidder attempted to purchase the CRO Division. These factors were of great importance to the Board because the Company was rapidly running out of cash as a result of the CRO's Division's losses, and because – so long as the CRO Division remained part of the Company – management could not focus resources and attention on the needs of the Corelab Division.

36.     Medifacts' management, however, remained skeptical that the Garretts had the financial wherewithal to close the transaction, or that they genuinely intended to take all necessary steps to achieve a closing.  Accordingly, in order to protect Medifacts in the event that the Garretts would not or could not close by January 2, 2007 – and given that Medifacts would not be proceeding with Veeda or Clinsys during this time – Medifacts requested that the Garretts post a $2 million, non-refundable cash deposit as a demonstration of their financial and emotional commitment to close the purchase.

37.     The Garretts agreed to post the deposit on the terms requested by Medifacts' management. On that basis, and given all the factors described above, Medifacts' management determined that it was in the best interests of the Company to accept the Garretts' bid and commence negotiations toward a definitive agreement.

<u>Negotiations Between Medifacts And The Garretts To Sell The CRO Division</u>

38.     Medifacts and the Garretts memorialized their agreement in principle to negotiate a sale of the CRO Division in a letter of intent, which consisted of five separate letters dated December 15 to December 23, 2006 (collectively, the "Letter of Intent").  The last of the five letters comprising the Letter of Intent – i.e., the third letter dated December 23, 2006 – was signed by both Bruce Garrett and Sandra Garrett.

39.     By its terms, the Letter of Intent bound the parties to negotiate in good faith toward a definitive agreement based on the economic terms of the Letter of Intent. In addition, the parties agreed that the Garrett's deposit was to be non-refundable. In this last respect, the Garretts agreed, and the Letter of Intent provides, that "[i]f for any reason whatsoever the purchase of the CRO Business is not consummated by [the Garretts] and the Company on or

before 5 pm EST on January 2, 2007 (the "Closing Date"), the Deposit shall be forfeited and shall become the sole property of the Company."

40.    From December 23, 2006 to January 2, 2007, Medifacts attempted in good faith to reach agreement with the Garretts on the terms of a definitive agreement based on the economic terms of the Letter of Intent. The Garretts, however, were unable to satisfy some of the most basic prerequisites required by the Letter of Intent.

41.    Among other things, as of January 2, 2007, the Garretts never provided to Medifacts' attorneys the form of the letter of credit that they were required to post under their offer, let alone the letter of credit itself. The letter of credit – which was to secure several million dollars in lease obligations that the Garretts were proposing to assume – was a key economic term in the transaction, especially given Medifacts' concerns about the Garretts' financial wherewithal. Similarly, although the Garretts' Letter of Intent provided for a $1.5 million promissory note secured by a pledge of Sandra Garretts' stock, Sandra Garrett repeatedly refused to represent and warrant that she actually owned and had not pledged the very stock that was to provide the security for the note.

42.    On January 2, 2007, the Closing Date set in the Letter of Intent, Bruce Garrett requested that Medifacts extend the time of closing. Because it did not appear that the Garretts could, in fact, consummate the transaction along the lines set forth in the Letter of Intent, Medifacts declined to extend the closing date, as was its explicit right under the Letter of Intent.

43.    As a result, pursuant to the Letter of Intent, "the Deposit [was] forfeited and ... bec[a]me the sole property of the Company." In addition, Medifacts was left – as Sandra and Bruce Garrett had expressly agreed in the Letter of Intent – without "further obligation of any

kind to Dr. B. Garrett under the Letter with respect to the sale of the CRO Business and shall be free to sell the CRO Business to any other third party."

The Garretts Attempt to Block the Sale of the CRO to Any Other Party

44.     Following the Garretts' failure to consummate the transaction contemplated by the Letter of Intent – and although it had no obligation of any kind to do so – Medifacts' management offered the Garretts one final chance to purchase the CRO. In a letter dated January 4, 2007, the Company proposed that the Garretts accept any one of three offers, which included a straight cash purchase, the sale of their entire stock interest, or a hybrid of these positions. Under any of these scenarios, the Garretts would also have received full credit for their $2 million deposit.

45.     The Garretts refused to discuss any of the three options unless Medifacts first either returned the $2 million deposit or placed it in escrow. Relying on the language of the Letter of Intent that both Sandra and Bruce Garrett had executed, Medifacts refused to agree to these demands.

46.     With the Garretts unwilling to negotiate, and with the need to sell the CRO Division becoming more urgent, management requested that its investment banker re-engage contacts with Veeda and Clinsys to determine if either was willing to reinstate its bid. Veeda declined to reinstate its bid.

47.     Clinsys, however, indicated that it was prepared to go forward with a letter of intent substantively identical to the offer it had made in December 2006. Under that offer, Clinsys agreed to pay $3,900,000 in cash for the CRO Division, with a closing date in mid-February.

48.    CEO Woehler noticed a Board meeting for January 11, 2007 to consider the Clinsys offer. Sandra Garrett attended the meeting. As in the past, because of Sandra Garrett's manifest self-interest in seeking to obtain the CRO Division for herself and her husband and/or the return of the Garretts' deposit, the Board requested that Sandra Garrett recuse herself during the portion of the meeting in which the Clinsys bid and the Garretts' Letter of Intent were discussed. Sandra Garrett refused.

49.    Despite her October 2006 vote authorizing Medifacts' plan to sell the CRO Division's assets to the best bidder, and despite her express agreement in the Letter of Intent that, if the Garretts' offer expired, Medifacts "shall be free to sell the CRO Business to any other third party," Sandra Garrett contended that she had the right under the Investor Rights Agreement, as the sole remaining CSD, to block any sale other than to herself and her husband. All other members of the Board stated that they disagreed with her interpretation of the Investor Rights Agreement.

50.    After consideration, all members of the Board, with the exception of Sandra Garrett, indicated that they believed the Clinsys offer was the best available offer and should be accepted in the best interest of the Company. The Board then resolved to vote on the Clinsys transaction, and again requested that, because of her self-interest, Sandra Garrett recuse herself from the vote. Sandra Garrett refused, and voted no. All of the remaining Board members voted in favor of accepting the transaction with Clinsys.

51.    Following the vote, the Board directed CEO Woehler to contact Clinsys and begin the process of negotiating a definitive agreement based on Clinsys's letter of intent. Had this transaction gone forward, the Company would have received $3.9 million in cash, the assumption of the CRO Division's liabilities, and other benefits – not least of which would have

been the cessation of losses arising from the continued operation of the CRO Division. In addition, the Company could have turned its resources and attention to furthering the growth and goals of the Corelab Division.

The Garretts Sue Medifacts

52.    Instead, on January 16, 2007, five days after the Board voted to accept the Clinsys offer, the Garretts filed a Verified Complaint against Medifacts in the Court of Chancery of the State of Delaware in and for New Castle County, case no. 2673-N (the "Garretts' Delaware Action").

53.    In the Garretts' Delaware Action, the Garretts sought to enjoin Medifacts from proceeding with a sale of the CRO Division to Clinsys. The Garretts also requested that the Court order specific performance of the Garretts' Letter of Intent, even though all members of the Board except Sandra Garrett had concluded that the proposed transaction with Clinsys was superior to the Garretts' bid.

54.    Sandra Garrett intended that, at a minimum, the Delaware Action would create sufficient uncertainty and confusion such that Clinsys would seek to withdraw its superior offer to purchase the CRO, leaving the Garretts as the only possible bidder. Indeed, shortly after the Garretts filed the Delaware Action, and specifically in response to the litigation, Clinsys insisted that its letter of intent be modified to delay the closing by approximately six weeks.

55.    Such a delay would have been highly damaging to Medifacts, because the cost of maintaining the CRO was rapidly draining Medifacts' dwindling cash reserves. In addition, the uncertainty and confusion created by the Garretts' actions were causing numerous employees of Medifacts to leave the Company and take employment elsewhere.

56.     The Garretts' Delaware Action also meant that the Company would need to spend hundreds of thousands of dollars on litigation, even though management considered the Delaware Action to be meritless.

Medifacts Files For Chapter 11 Bankruptcy

57.     As of mid- to late-January 2007, therefore, Medifacts' management was faced with the following situation: The Company was set to run out of cash as early as April 1, 2007; had a declining backlog of work with a nearly non-existent pipeline in its CRO Division; lost $4.9 million in its cash position and $4.2 million in its working capital position in the first eleven months of 2006; had no prospects for an infusion of debt or equity capital; suffered the termination of its revolving credit facility due to an alleged covenant default; was draining money, energy and personnel from its otherwise successful Corelab Division; and was likely to spend between $500,000 and $800,000 defending itself in the meritless litigation brought by the Garretts in their effort to compel a self-interested sale of the CRO Division at a below-market price. Accordingly, management believed it essential for the Board to meet immediately to consider the strategic options facing the Company – including, potentially, a Chapter 11 filing.

58.     On Friday, January 26, 2007, Mr. Woehler notified all Board members, including Sandra Garrett, that a Board meeting would be held on Sunday morning, January 28, 2007, to consider strategic alternatives.  A PowerPoint presentation circulated by Mr. Woehler to the Board (including Sandra Garrett) for discussion at the Board meeting expressly stated that, unless immediate steps were taken, "insolvency [was] inevitable."

59.     Sandra Garrett did not attend the Board meeting at 9 a.m. on Sunday, January 28, 2007.  Sandra Garrett believed that, by staying away from the Board meeting, she could force an adjournment of the meeting and cause additional delay.  Additionally, Sandra Garrett believed,

erroneously, that the Board could not authorize a bankruptcy filing without the vote of the sole remaining CSD.

60.     Instead of attending the Board meeting, Sandra Garrett instead resolved to attempt to stop any consideration of bankruptcy by filing first in the Chancery Court. Thus, in an effort to gain time for her lawyers to act, Sandra Garrett caused Bruce Garrett – who improperly had access to Sandra Garrett's Company email account – to inform the remainder of the Board that she was completely unavailable on the morning of January 28, 2007. Moreover, in furtherance of their plan, Bruce Garrett also demanded, on Sandra Garrett's behalf, that any Board meeting be postponed until the afternoon of Monday, January 29, 2007. Bruce Garrett gave no explanation as to why such a delay was necessary; nor did he explain why Sandra Garrett could not be available before that time; nor did he explain that the Garretts' actual motive was to file for expedited equitable relief in Chancery Court on Monday morning.

61.      The Board rejected Bruce Garrett's request that the meeting be further delayed, and met again at 8 p.m. on Sunday, January 28, 2007 pursuant to Article II, Section 8, of the Company's by-laws. Although all other Board members attended the meeting, Sandra Garrett failed to attend. Once again, Sandra Garrett chose not to attend the second meeting because she erroneously believed that, by doing so, she could "block" any action by the Board and could instead advance her own interest in obtaining the CRO.

62.     Under Medifacts' by-laws (Article II, Section 8), the presence of a majority of the Board at this second meeting constituted a quorum. After a meeting lasting between 90 minutes and 2 hours, in which the financial and legal options available to the Company were thoroughly discussed, the Board voted to authorize an immediate Chapter 11 filing. Medifacts filed its Chapter 11 petition (the "Petition") on January 28, 2007.

### The Garretts Attempt to Obstruct Medifacts' Reorganization

63.     Once the Petition was filed, the Garretts continued their efforts to obstruct the orderly reorganization of the Company, including any sale of the CRO Division to a bidder other than themselves. Within days of the filing of the Petition, Sandra and Bruce Garrett filed a motion to dismiss the bankruptcy and/or to obtain relief from the automatic stay.  The Garretts' took these actions in the bankruptcy proceeding specifically to compel Medifacts to accept the Garretts' bid for the CRO Division, despite the Board's majority vote to accept the Clinsys offer as in the best interests of the Company.

64.     The Garretts' motion to dismiss forced Medifacts to expend significant resources to conduct discovery and present arguments to the Bankruptcy Court on an expedited basis.

### The Garretts Obtain the CRO at a Lower Price

65.      On February 5, 2007, the Board met to consider whether to ratify the Chapter 11 filing and to authorize management to take actions consistent therewith.  Despite their earlier objections to the filing of the Petition – and the substantial cost and expense that the Garretts had forced the Company to expend – Sandra Garrett voted at this meeting to ratify the bankruptcy. The Garretts subsequently notified the Court that they were also no longer seeking specific performance in the Chancery Court.

66.     Instead, the Garretts withdrew their motion to dismiss with prejudice and announced their intention to bid on the now badly-diminished CRO Division assets.

67.     Medifacts held an auction on the remaining CRO Division assets on March 7, 2007.  At that point, the only bidder for the CRO Division was the Garretts – who offered to pay $2.15 million, including credit for their $2 million deposit, rather than the $3.5 million they had originally bid. Meanwhile, Clinsys – which only a few weeks earlier had offered $3.9 million for

the entire CRO Division – was now willing to bid only $150,000 for a small piece of the CRO

assets, and was unwilling to put in any bid for the CRO Division as a whole.

68.     With the Garretts' bid the only offer on the table, Medifacts elected to accept the

Garretts' offer to purchase the CRO Division for $2.15 million, with credit for the $2 million

deposit that the Garretts previously paid to the Company.

69.     Sandra Garrett's self-dealing, aided and abetted by her husband Bruce Garrett,

caused Medifacts to lose the opportunity to sell the CRO Division in January 2007 for $3.9

million.  Instead, Medifacts received only $2.15 million – a reduction of $1.75 million that is not

now available to pay claims of creditors. At the same time, the Garretts have enjoyed a windfall

of a similar amount.

70.     Moreover, Medifacts needlessly expended hundreds of thousands of dollars

keeping the CRO Division running through March 2007, as well as many hundreds of thousands

of dollars in fees for lawyers, financial advisers and investment bankers that were necessary to

respond to the Garretts' wrongful activities. Worse still, because of the Garretts' activities,

Medifacts was – and continues to be – unable to devote the financial and managerial resources to

the Corelab that it would have been able to had it been able to consummate the superior, Board-

approved transaction with Clinsys. All of these actions have left Medifacts less able to pay its

creditors in connection with the Chapter 11 reorganization.

<u>Sandra Garrett's Inequitable Insistence On Payment Of Severance</u>

71.     As CEO of Medifacts, Sandra Garrett had an employment agreement that

provided for an annual salary of $300,000 and that could not be terminated before April of 2006.

Sandra Garrett's employment agreement contained a provision for payment of severance for 18

months following her termination.

72.     After April 2006, Sandra Garrett and the Board of Medifacts negotiated for Sandra Garrett to relinquish her position as CEO and instead to become non-executive Chairperson of the Board.  The parties agreed on a Chairperson's Agreement, which was signed in June 2006, wherein Sandra Garrett was paid $350,000 per year, and had a two year severance agreement.

73.     In August 2006, after a large contract was cancelled, the interim General Manager of Medifacts set forth recommendations to improve Medifacts' financial viability.  These recommendations included a large reduction in force and the elimination of Sandra Garrett's position as Chairperson.

74.     In September 2006, Sandra Garrett threatened that she would not attend any Board meetings where the Board would consider terminating her position.  In response, Medifacts attempted to negotiate with Sandra Garrett in an attempt to reduce her position to part-time, with a corresponding reduction in salary, which Sandra Garrett had earlier proposed. However, Sandra Garrett refused to negotiate with Medifacts.

75.     In September 2006, Sandra Garrett also began threatening to block certain corporate actions because Medifacts was attempting to eliminate her position.  At the September 25, 2006 Board meeting, Medifacts made the decision to terminate Sandra Garrett without cause, as it could not afford to pay her salary and the salary of CEO Michael Woehler.  Accordingly, the severance provision in Sandra Garrett's Chairperson's Agreement came into effect.

76.     Sandra Garrett, knowing that the Company could not afford to pay her salary, refused to step down or negotiate a lower salary, even though it would have been in the best interest of the Company to do so, and even though she had previously proposed just such a reduction herself as being in the best interests of the Company.

77.     Instead, letting her own interests guide her actions, Sandra Garrett forced Medifacts to terminate her so that she would receive two years of severance.

## COUNT I

*(Equitable Subordination - 11 U.S.C. § 510(c)(1))*

78.     Medifacts repeats and realleges the allegations set forth in the foregoing paragraphs as if set forth fully herein.

79.     Sandra Garrett has engaged in inequitable conduct, including, but not limited to, breach of fiduciary duty.

80.     Sandra Garrett used her position as an insider of the Company to serve her own interest, unjustly enriching herself and causing damage to Medifacts.

81.     Sandra Garrett's conduct resulted in damage to the estate, Medifacts, the other creditors, and the shareholders, and conferred an unfair advantage on herself and her husband.

82.     Equitable subordination of Sandra Garrett's claim for severance and the other claims she has brought against the Company, as outlined in Claim No. 82 filed on June 4, 2007 ("Garrett Claim"), is not inconsistent with the provisions of the Bankruptcy Code.  A copy of the Garrett Claim is attached hereto as Exhibit A.

83.     As a result of Sandra Garrett's inequitable conduct, the Garrett Claim should be equitably subordinated to the claims of all other creditors of the Debtor pursuant to 11 U.S.C. § 510(c)(1) and the equitable powers of the Court.

## COUNT II

*(Breach Of The Fiduciary Duty Of Loyalty – Sandra Garrett)*

84.     Medifacts repeats and realleges the allegations set forth in the foregoing paragraphs as if set forth fully herein.

85.    As a Director of Medifacts, Sandra Garrett owes Medifacts fiduciary duties to act with the utmost good faith and loyalty.

86.    Sandra Garrett engaged in a course of conduct that was intended to further her and her husband's goal of purchasing the CRO Division at the lowest possible price.

87.    Since October 2006, Sandra Garrett has, among other things,

(a) requested that the other CSD resign, leaving her as the sole remaining CSD, with the intent of using that status to claim "blocking rights" under the Investor Rights Agreement;

(b) refused to recuse herself when the Board considered the Garretts' offer to purchase the CRO Division;

(c) requested that the second CSD resign her position, and then failed to fill the vacancy, in order to, in Sandra Garrett's view, strengthen her position as sole CSD on the Board;

(d) forced the Board to accept the Garretts' revised bids for the CRO Division after the bidding deadline;

(e) shared confidential information about bids by Clinsys and Veeda for the CRO Division with her husband so he could tailor a more competitive bid;

(f) voted against the superior Clinsys offer even though Medifacts' financial health was in danger;

(g) pursued expensive and burdensome litigation against Medifacts to halt the sale of the CRO Division to Clinsys in order to advance her own interests;

(h) willfully stayed away from two critical Board meetings in the hopes of stymieing the filing of the Petition and gaining time for her own attorneys to bring additional litigation in the Delaware Chancery Court;

(i) brought litigation on her own behalf in Bankruptcy Court, hoping that Medifacts' Petition would be halted or delayed and that the expensive litigation in the Chancery Court would be permitted to continue; and

(j) filed a motion to dismiss Medifacts' bankruptcy action for the improper and ulterior purpose of obstructing the sale of the CRO Division to any bidder other than the Garretts.

88.    The ultimate result of Sandra Garretts' course of conduct was that Sandra and Bruce Garrett purchased the CRO Division in a bankruptcy auction at a price much lower than the original Veeda or Clinsys offers, thereby causing damage to Medifacts and its creditors and shareholders, and a corresponding windfall to themselves.  Moreover, Medifacts suffered substantial loss as a result of, *inter alia*, expending hundreds of thousands of dollars in legal, financial and consulting services necessitated by the Garretts' self-dealing schemes.

89.    None of Sandra Garrett's actions in this regard have constituted fair dealing or fair process, as they have been self-interested and aimed at the financial gain of the Garretts instead of the best interest of Medifacts.

90.    Through the conduct described herein, Sandra Garrett breached her fiduciary duties to Medifacts.

91.    Medifacts, as debtor-in-possesion, seeks for the benefit of its creditors and shareholders those losses, in an amount to be determined at trial, that resulted from Sandra Garrett's breaches of her fiduciary duties.

92.    Specifically, and in addion to the foregoing, Sandra Garrett's breach of fiduciary duty caused Medifacts to suffer losses that include, but are not limited to, all of the attorneys'

fees paid by Medifacts to negotiate the Garrett LOI, litigate the Chancery Court matter, and

litigate the Motion to Dismiss in Bankruptcy Court.    To date, the attorneys' fees include:

| Firm | Description | Dates | Fees and Expenses | | |
|---|---|---|---|---|---|
| Smith, Katzenstein, Furlow LLP | Local Counsel representation of Medifacts International in Delaware Chancery Court proceedings. | Dec. 21, 2006 – Feb. 27, 2007 | Fees:<br>Expenses:<br><br>**Total :** | $10,220.00<br>$851.68<br><br>**$11,071.68** | |
| Foley & Lardner LLP | Actions undertaken to effectuate the aborted sale of the CRO Division to multiple bidder and eventually, the Garretts. | Dec. 7, 2006 – Dec. 31, 2006 | Fees:<br>Expenses:<br><br>**Total:** | $19,267.00<br>$77.60<br><br>**$19,344.60** | |
| Foley & Lardner LLP | Assist with aborted sale to Clinsys.  Litigation and defense of Chancery Court action brought by the Garretts. | Jan. 1, 2007 – Jan. 24, 2007 | Fees:<br>Expenses:<br><br>**Total:** | $53,490.00<br>$1,073.60<br><br>**$54,563.60** | |
| Foley & Lardner LLP | Litigation with Garretts in Bankruptcy Court proceedings. | Jan. 29, 2007 – Feb. 28, 2007 | Fees:<br>Expenses:<br><br>**Total:** | $258,475.00<br>$4200.58<br><br>**$262,675.58** | |
| Young Conaway Stargatt & Taylor, LLP | Local representation of Medifacts International in litigation with Garretts in Bankruptcy Court proceedings. | Jan. 29, 2007 – Feb. 28, 2007 | Fees:<br>Expenses:<br><br>**Total:** | $72,702<br>6,697.61<br><br>**$79,399.61** | |
| **TOTAL** | | | **$427,055.07** | | |

## COUNT III

*(Aiding And Abetting A Breach Of Fiduciary Duty – Bruce Garrett)*

93.    Medifacts repeats and realleges the allegations set forth in the foregoing

paragraphs as if set forth fully herein.

94.    As Medifacts' director, Sandra Garrett owes Medifacts fiduciary duties of utmost

good faith and loyalty.

95.    Through the conduct described herein, Sandra Garrett breached her fiduciary duties to Medifacts by, *inter alia*, sharing confidential information about bids by Clinsys and Veeda for the CRO Division with her husband so he could offer a more competitive bid.

96.    Bruce Garrett participated in Sandra Garrett's breaches of her fiduciary duties to Medifacts.

97.    Bruce Garrett knew of Sandra Garrett's breaches of her fiduciary duties to Medifacts and actively participated in them such that he could not reasonably be held to have acted in good faith.

98.    As a result of Bruce Garrett's aiding and abetting Sandra Garrett's breaches of her fiduciary duties, Medifacts has suffered and will continue to suffer substantial losses in an amount to be proven at trial. Through this action, Medifacts seeks to recover these losses for the benefit of its creditors and shareholders.

**WHEREFORE,** Debtor Medifacts International, Inc., prays that this Court:

A.    Enter judgment in its favor and against the defendants on Counts I through III of the Complaint;

B.    Subordinate the Garrett Claim for all purposes to the claims of all other creditors in Medifacts' bankruptcy case;

C.    Order Sandra Garrett and Bruce Garrett, jointly and severally, to make restitution for all sums improperly obtained as a result of their breach of fiduciary duty and aiding and abetting, and make such sums available for the creditors and shareholders of Medifacts;

D.    Award Medifacts its damages, including special damages, in an amount to be determined at trial, which damages Medifacts may use for the benefit of its creditors and shareholders;

E.    Award Medifacts its reasonable attorneys' fees, costs, and statutory interest in this action; and

F.    Enter such other and further relief as is just and appropriate in the circumstances.

Dated: Wilmington, Delaware
June 26, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Michael R. Nestor (No. 3526)
John T. Dorsey (No. 2988)
Joseph A. Malfitano (No. 4020)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

FOLEY & LARDNER LLP
Michael J. Tuteur (*pro hac vice*)
Michael R. Richman (*pro hac vice*)
Stephen D. Riden (*pro hac vice*)
111 Huntington Ave., Suite 2600
Boston, Massachusetts 02199
Telephone: 617-342-4000
Facsimile: 617-342-4001

Counsel to the Debtor and Debtor-in Possession
Medifacts International, Inc.

# EXHIBIT A

ORIGINAL

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor: MediFacts International, Inc. | Case Number 07-10110 (PJW) Jointly Administered |
|---|---|

Filed: USBC - District of Delaware
Medifacts International, Inc., Et Al.
07-10110 (PJW)        0000000082

**NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.**

Name of Creditor (The person or entity to whom the debtor owes money or property):
SANDRA S. GARRETT, M.D.
7722 LAUREL LEAF DRIVE
POTOMAC, MD 20854

Name and address where notices should *also* be sent:
DAVID J. TEKLITS, ESQUIRE
ROBERT J. DEHNEY, ESQUIRE
MORRIS, NICHOLS, ARSHT, & TUNNELL LLP
1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347
Telephone number: (302) 658-9200

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces if this claim ☐ amends a previously filed claim, dated:_____ |
|---|---|

**1. Basis For Claim**
☐ Goods sold
☒ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other See Exhibit A

☐ Retiree Benefits as defined in 11 U.S.C. § 1114(a)
☒ Wages, salaries, and compensation (fill out below)
  Last four digits of SS# _2662_
  Unpaid Compensation for services performed
  from: _____ to: _____
         (date)              (date)

**2. Date debt was incurred:** See Exhibit A

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $ See Exhibit A
☒ Check this box if: a) there is no collateral or lien securing your claim or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim.**
☒ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority

Amount entitled to priority $ See Exhibit A

Specify the priority of the claim

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)
☒ Wages, salaries, or commissions (up to $10,000), * earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4)
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5)

**Secured Claim.**
☒ Check this box if your claim is secured by collateral (including a right of setoff).

Brief description of Collateral:
☐ Real Estate   ☐ Motor Vehicle   ☒ Other See Exhibit A

Value of Collateral: $ See Exhibit A

Amount of arrearage and other charges at time case filed included in secured claim, if any $ See Exhibit A

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7)
☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8)
☒ Other – specify applicable paragraph of 11 U.S.C. § 507(a)(2).
 * Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:** $ _See Exhibit A_    See Exhibit A    See Exhibit A    See Exhibit A
 (unsecured)    (secured)    (priority)    (Total)
☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 6. **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

7. **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. **Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

FILED / RECEIVED

JUN 0 4 2007

BANKRUPTCY SERVICES, LLC

| Date
June 1, 2007 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): *Sandra S. Garrett M.O. by Kim Coen*
Kevin M. Coen as attorney for SANDARA S. GARRETT, M.D. |
|---|---|

*Penalty for presenting fraudulent claim*: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.        845316

## PROOF OF CLAIM OF
## SANDRA S. GARRETT, M.D.

### EXHIBIT A

EXPLANATION OF CLAIM

1.    Claim and Basis for Claim.

      Sandra S. Garrett. M.D. ("Claimant"), an officer and director of MediFacts International, Inc. (collectively, with all of its affiliated debtors and debtors in possession in jointly administered Case No. 07-10110 (PJW) pending in the United States Bankruptcy Court for the District of Delaware, the "Debtors"), hereby asserts all claims and rights under applicable law, equity, agreements, court orders, regulations, each of the Debtors' charter and bylaws, actions by the Debtors boards of directors or shareholders, policies of insurance, and any supplements, modifications and amendments to the foregoing, or any other documents, whether such claims and rights are contingent, liquidated, unliquidated, matured, unmatured, known, unknown or otherwise, that Claimant has or may have against the Debtors, including, without limitation, all claims for advancements, indemnification, compensation, other employment-related benefits promised or contractually-obligated by Debtors or otherwise committed to Claimant including without limitation health care benefits, bonuses, stock options, stock grants, obligations related to termination with or without cause, rights arising under a constructive trust, board fees, reimbursements, advancements of fees and expenses, indemnification and contribution under or arising from any applicable law, rule, agreement or document, and all rights of setoff and recoupment.  This claim also includes, without limitation and to the extent applicable, all additional costs, expenses, interest, attorney fees, consultant and expert fees and any other charges, whether incurred prior to, on or after the petition date.  This claim includes, without limitation, (1) any investigation or proceeding of any kind that is being, or may be, pursued by the United States Department of Justice, the United States Securities and Exchange Commission, and any other state or federal government entity; (2) any investigation or proceeding of any kind that is being, or may be, pursued by any entity involved with or related to the Debtors' bankruptcy proceedings, and (3) any proceedings of any kind instituted by any private litigant in any forum, whether direct or derivative in nature (collectively, the "Proceedings"), and seeks advancement, indemnification, contribution and reimbursement from the Debtors for all prepetition fees and expenses, as well as all fees, costs and other charges and expenses that have been incurred on Claimant's behalf since the Debtors filed their petitions for relief under Chapter 11 of the United States Bankruptcy Code , and those that will be incurred on the Claimant's behalf in the future, as a result of the Proceedings.  Claimant also seeks advancement, indemnification, contribution and reimbursement from the Debtors in an unspecified amount that Claimant may incur in the future as a result of the Proceedings and any future Proceedings.  To the extent applicable, this claim includes, without limitation, Claimant's rights to any proceeds of any applicable insurance policy of the Debtors or any other person or entity.  Without in any way limiting the foregoing, this Claim includes the following liquidated amounts:

| | |
|---|---|
| Owed severance benefits (including unpaid sick leave) | $    655,963.95 |
| Owed health benefits (including COBRA) | $ To Be Determined |
| Owed car lease payments | $      19,200.00 |
| Owed indemfication obligation | $ To Be Determined |

These amounts include any applicable taxes or other associated obligations to be paid by the Debtors on Claimant's behalf. The total amount of the claim includes the liquidated claims listed above, plus all unliquidated and undetermined claims, including without limitation, all contingent claims and claims that are unknown at this time.

The owed severance benefits, owed health benefits. and owed car lease payments are owed to the Claimant pursuant to section 5(c) of the Chairperson Employment Agreement by and between the Debtors and the Claimant. A copy of the executed Chairperson Employment Agreement is attached hereto as Exhibit B. Attached as Exhibit C is a letter from the Claimant to the Debtors dated November 1, 2006 reaffirming her release. Copies of the other documents upon which this claim is based (including, but not limited to the Debtors' charter and bylaws) should be held by the Debtors. Accordingly, copies are not attached, but will be made available upon reasonable request.

2.    Classification of Claim.

For all outstanding obligations, Claimant's claims are secured claims to the extent secured by any applicable letters of credit, policies of insurance, indemnification agreements, rights of setoff or recoupment, constructive trusts, or other applicable law, agreements or documents, or as determined by a court to constitute secured claims. Certain portions of the outstanding obligations may also constitute priority claims pursuant to Section 507 of the Bankruptcy Code, or as determined by a court to constitute priority claims. In addition, certain portions of the outstanding obligations may also constitute administrative claims pursuant to Section 503 of the Bankruptcy Code, or as determined by a court to constitute administrative claims. Finally, certain portions of the outstanding obligations may be determined by a Court to constitute general, unsecured claims. To the extent a Court so determines that the outstanding obligations constitute secured, priority, administrative or general unsecured claims, those claims are hereby asserted as such.

3.    Reservation of Rights and Remedies.

The Claimant hereby reserves and preserves his right to assert any and all claims for advancement of defense costs, contribution, indemnification and/or reimbursement to the extent provided in any written agreement with the Debtors, the Debtors' certificates of incorporation as in effect prior to or as of the Confirmation Date or the Debtors' bylaws in effect prior to or as of the Confirmation Date or as permitted by applicable law.

The Proof of Claim is filed with (a) full reservation of rights and remedies, including, without limitation, the right to assert additional, modified, supplementary and/or amended proofs of claim and requests for administrative expenses based on, inter alia, events, information and/or documents obtained from the Debtors or others through discovery or

845316

2

otherwise and with (b) full reservation of (i) Claimant's rights and/or claims against any party other than the Debtors and (ii) Claimant's interests in any property, including proceeds of any insurance policy and any property of the estate(s). Without in any way limiting the foregoing, Claimant reserves Claimant's rights to assert any claim Claimant may have against the Debtors or against any other party or property other than the Debtors' and their estates. This Proof of Claim is conditional only and is not intended, nor should it be construed, as Claimant's consent to jurisdiction in the United States Bankruptcy Court, or as a waiver of Claimant's right to a trial by jury in any action or proceeding. This Proof of Claim is filed without prejudice to any cause of action against the Debtors not constituting a "claim" under 11 U.S.C. §101(5).

    4.    <u>Notices</u>. All notices concerning this proof of claim should be sent to:

Sandra S. Garrett, M.D.
7722 Laurel Leaf Drive
Potomac, MD 20854

-and-

Morris, Nichols, Arsht & Tunnell LLP
Attn:   David J. Teklits, Esq.
         Robert J. Dehney, Esq.
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
(302) 658-3989 fax

845316

3