## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------ x

In re:                                                   :     Chapter 11

                                                         :     Case No. 07-10110 (PJW)

MEDIFACTS INTERNATIONAL, INC.,                           :

            Debtor.                                      :

                                                         :

------------------------------------------------------ x

------------------------------------------------------ x

                                                         :

MEDIFACTS INTERNATIONAL, INC.,                           :

            Plaintiff,                                    :

                                                         :

      v.                                                  :

                                                         :

SANDRA S. GARRETT and                                    :     Adv. Proceeding No. 07-50973
BRUCE N. GARRETT,                                        :

            Defendants, Counterclaim and                  :
            Third-Party Plaintiffs

                                                         :

      v.                                                  :

                                                         :

MICHAEL   WOEHLER,   HERBERT   H.                        :
HOOPER, EUGENE D. HILL, III, SAMUEL                      :
BARTNETT and SUSAN PRAVDA,                               :

            Counterclaim and                              :
            Third-Party Defendants                        :

                                                         :

------------------------------------------------------ :
                                                         x


**ANSWER TO THE AMENDED COMPLAINT, COUNTERCLAIM
AND THIRD-PARTY CLAIMS OF DEFENDANTS,
COUNTERCLAIM AND THIRD-PARTY PLAINTIFFS
SANDRA S. GARRETT AND BRUCE N. GARRETT**

Defendants Sandra S. Garrett, Ph.D and Bruce N. Garrett, M.D. (together, the "Garretts"), answer Plaintiff's Complaint as follows:

1.    Denied.

2.    Denied, except Defendants admit that Debtor purports to bring this action for its creditors and shareholders and to seek monetary damages.

3.    Admitted that Dr. Sandra Garrett resides in Maryland and has been a director of Medifacts since 2004.

4.    Admitted.

5.    Admitted.

6.    Denied.

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.    Denied, except it is admitted that in December of 2004, Ampersand 2001 Limited Partnership, International Life Sciences Fund III, L.P. and certain of their affiliates invested in Medifacts in exchange for Series A Preferred Shares.

11.    Denied, except Defendants admit that certain parties entered into a stockholders' agreement dated December 21, 2004 (the "Stockholders' Agreement"), and for further answer, Defendants respectfully refer the Court to that agreement for a complete and accurate statement of its terms.

12.    Denied, except Defendants admit that certain parties entered into an Investor Rights Agreement dated December 21, 2004, and for further answer, Defendants respectfully refer the Court to that agreement for a complete and accurate statement of its terms.

13.     Paragraph 13 states a legal conclusion as to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 13.

14.     Denied, except Defendants admit that Medifacts' financial position deteriorated and that the Board held meetings to discuss Medifacts' financial problems.

15.     Denied, except it is admitted that Medifacts' financial position would potentially improve with a sale of the CRO Division.

16.     Denied, except Defendants admit that Sandra Garrett was aware of Medifacts financial situation in the summer of 2006.

17.     Denied.

18.     Denied, except Defendants admit that the Medifacts Board decided to retain an investment banker to explore the possibility of a sale of the CRO Division in the fall of 2006.

19.     Denied, except Defendants admit that at an October 2006 Board meeting, the Board, including Dr. Garrett, selected an investment banker to assist the Board in considering the sale of the CRO Division.

20.     Denied, except Defendants admit that Sandra Garrett, at the urging of the Medifacts Board, informed the Board that Dr. Bruce Garrett would submit an offer to purchase the CRO Division.

21.     Denied, except Defendants admit that in November, 2006, Dr. Bruce Garrett submitted an offer to purchase the CRO Division and sent correspondence to Medifacts relating to that offer, and for further answer, Defendants respectfully refer the Court to those documents for a complete and accurate statement of their terms.

22.     Denied.

23.     Denied, except Defendants admit that Sandra Garrett recused herself from discussions regarding Bruce Garrett's offer to purchase the CRO Division at a meeting subsequent to when Bruce Garrett submitted his offer and participated in certain meetings of the Board to fulfill her fiduciary duties to the Company and its stockholders.

24.     Denied, except Defendants admit that, in addition to the offer from Dr. Bruce Garrett, Medifacts received offers to purchase the CRO Division from Veeda Clinical Research Limited ("Veeda") and from Clinical Systems, Inc. ("Clinsys") in December 2006.

25.     Denied, except Defendants admit Dr. Bruce Garrett, Veeda and Clinsys offered to purchase the CRO Division, and for further answer, Defendants respectfully refer the Court to those offers for a complete and accurate statement of their terms.  For a further answer, Defendants affirmatively allege that Medifacts' financial advisor determined that the bid of Dr. Bruce Garrett was financially superior to the other bids.

26.     Denied, except Defendants admit that Medifacts encouraged Dr. Bruce Garrett to improve his offer, which he did.

27.     Denied, except Defendants admit that the Medifacts Board met on December 22, 2006 to consider the offers for the CRO Division.

28.     Denied, except Defendants admit that, at the December 22, 2006 Board meeting, Dr. Sandra Garrett recommended to the Board that Medifacts' investment banker inquire if Dr. Bruce Garrett and Veeda were willing to improve their offers, and for further answer, Defendants affirmatively allege that Dr. Bruce Garrett improved his offer for the CRO Division after such time.

29.     Denied.

4

30.    Denied, except Defendants admit that Ms. Pravda resigned as a director in December, 2006 at Dr. Sandra Garrett's request.

31.    Denied.

32.    Denied, and for further answer, Defendants state that the common shareholders elected Maury Satin as a director of the Company by written consent in March 2007.

33.    Denied.

34.    Denied, except Defendants admit that Bruce Garrett submitted a revised bid to purchase the CRO Division on December 23, 2006 in response to the inquiry from Medifacts' investment banker, and for further answer, Defendants respectfully refer the Court to that offer for a complete and accurate statement of its terms.

35.    Denied, except Defendants admit that the Medifacts Board determined, based upon the advice of its investment banker, that Dr. Bruce Garrett's offer was superior to the other offers for the CRO division and that the offer contemplated a closing date of January 2, 2007, and for further answer, Defendants respectfully refer the Court to the offer for a complete and accurate statement of its terms.

36.    Denied, except Defendants admit that Dr. Bruce Garrett provided a $2 million cash deposit towards the purchase of the CRO Division at the request of Medifacts' Board and based upon the express promise of Medifacts and its Board and management that they would act in good faith to close the transaction.

37.    Denied, except Defendants admit that Dr. Bruce Garrett provided a $2 million cash deposit towards the purchase of the CRO Division based upon the express promise

of Medifacts and its Board and management that they would act in good faith to close the transaction.

38.    Denied, except Defendants admit that the Garretts and the Company entered into a binding letter of intent on December 23, 2007, and for further answer, Defendants respectfully refer the Court to that letter of intent for a complete and accurate statement of its terms.

39.    Denied, except Defendants admit that the letter of intent signed on December 23, 2007 bound the parties to act in good faith to consummate the sale of the CRO Division on the terms outlined in the December 23, 2007 letter of intent, and for further answer, Defendants respectfully refer the Court to that letter of intent for a complete and accurate statement of its terms.

40.    Denied.

41.    Denied.

42.    Denied, except Defendants admit that on January 2, 2007, Dr. Bruce Garrett requested that Medifacts extend the Closing Date and Medifacts refused to extend the time despite the fact that the Medifacts Board, management and advisors failed to act in good faith to consummate the transaction by the Closing Date in breach of the terms of the Letter of Intent.

43.    Denied.

44.    Denied, except Defendants admit that subsequent to January 2, 2007, the Medifacts Board and management refused to return the Garretts deposit and attempted to force the Garretts to purchase the CRO Division on terms much more onerous to the Garretts than the terms agreed to in the Letter of Intent.

45.     Denied, except Defendants admit that they demanded that Medifacts either return their $2 million deposit or place it in escrow as a pre-condition to any further discussion of the purchase of the CRO Division.

46.     Denied, and for further answer, Defendants affirmatively allege that, at all relevant times, Dr. Bruce Garrett was willing to consummate the purchase of the CRO Division on the terms set forth in the letter of intent.

47.     Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 47, and for further answer, Defendants affirmatively assert that Medifacts' investment banker determined that the offer of Dr. Bruce Garrett was financially superior to the offer to Clinsys.

48.     Denied, except Defendants admit that the Company's CEO called a board meeting for January 11, 2007 and Dr. Sandra Garrett attended the meeting.

49.     Denied.

50.     Denied, except Defendants admit that the Medifacts Board decided to accept Clinsys' inferior offer over Dr. Sandra Garrett's objection and without the consent of a common stockholder director.

51.     Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 51

52.     Denied, except Defendants admit that they filed a Complaint against Medifacts, Michael Woehler, Herbert H. Hooper, Eugene D. Hill III, Samuel Bartnett, Ampersand 2001 Limited Partnership, and International Life Sciences Fund III (LP1), L.P. in the Delaware Court of Chancery on January 16, 2007.

53.     Denied, except Defendants admit that, in the Court of Chancery action, they sought, among other things, to enjoin Medifacts from proceeding with a sale of the CRO Division to Clinsys, which Medifacts' investment banker had determined was inferior to the offer of Dr. Bruce Garrett, and sought the specific performance of the Letter of Intent, and for further answer, Defendants respectfully refer the Court to the Complaint for a complete and accurate statement of its terms.

54.     Denied, and for further answer, Defendants affirmatively allege that they sought a prompt resolution of their claims to avoid further damage to Medifacts from the improper actions of its Board, management and preferred sharheolders, which the Defendants in the Chancery Court action resisted.

55.     Denied, and for further answer, Defendants affirmatively allege that they sought a prompt resolution of their claims to avoid further damage to Medifacts from the improper actions of its Board, management and preferred sharheolders, which the Defendants in the Chancery Court action resisted.

56.     Denied.

57.     Denied.

58.     Denied, except Defendants admit that on the afternoon of Friday, January 26, 2007, Mr. Woehler sent an email to the members of the Medifacts Board requesting that Board meeting be held on Sunday morning, January 28, 2007, and for further answer, Defendants affirmatively allege that Mr. Woehler never informed the Board that he and the other Defendants in the Court of Chancery action, without the knowledge of the Board, were planning to file for bankruptcy to avoid the resolution of the claims in the Court of Chancery.

59.     Denied, except Defendants admit that Dr. Sandra Garrett was unable to attend a board meeting at 9 a.m. on Sunday, January 28, 2007, as she informed Mr. Woehler.

60.     Denied, except Defendants admit that Dr. Sandra Garrett advised Mr. Woehler that she could not participate in a Board meeting until Monday afternoon and the Medifacts Board and management refused Dr. Garrett's request that the Board meeting be postponed until Monday.

61.     Denied, except Defendants admit that Sandra Garrett was unable to attend a board meeting at 8 p.m. on Sunday, January 28, 2007.

62.     Denied, except Defendants admit that Medifacts filed a Chapter 11 petition on Sunday, January 28, 2007.

63.     Denied, except Defendants admit that they filed a motion to dismiss Medifacts' improperly filed bankruptcy petition and/or obtain relief from the automatic stay on January 30, 2007.

64.     Denied.

65.     Denied, except Defendants admit that the Medifacts Board met on February 5, 2007, and that they notified the Court that they were no longer seeking specific performance in the Court of Chancery because the improperly filed bankruptcy petition had caused substantial damage to Medifacts, including the CRO Division, which would not have occurred if the petition had not been improperly filed to prevent resolution of the Chancery Court claims.

66.     Denied, except Defendants admit that they withdrew their motion to dismiss with prejudice because the improperly filed bankruptcy petition had caused substantial

damage to Medifacts, including the CRO Division, which would not have occurred if the petition had not been improperly filed to prevent resolution of the Chancery Court claims.

67.    Denied, except Defendants admit that Medifacts held an auction of the CRO Division on March 7, 2007, and that a Company affiliated with the Garretts was the successful bidder, and for a further answer, Defendants affirmatively allege that the improper actions of Medifacts Board (not including Dr. Sandra Garrett), management and preferred shareholders, including the improvidently filed bankruptcy petition, caused substantial damage to Medifacts, including the CRO Division.

68.    Denied, except Defendants admit that Medifacts held an auction of the CRO Division on March 7, 2007, and that a Company affiliated with the Garretts was the successful bidder.

69.    Denied, and for further answer, Defendants affirmatively allege that any damage to Medifacts was caused by the failure of the Medifacts' Board (not including Dr. Sandra Garrett), management and preferred shareholders to act in good faith to consummate the transaction with Dr. Bruce Garrett and decision to file improperly for bankruptcy to avoid resolution of the Chancery Court claims.

70.    Denied, and for further answer, Defendants affirmatively allege that any damage to Medifacts was caused by the failure of the Medifacts' Board, management and preferred shareholders to act in good faith to consummate the transaction with Dr. Bruce Garrett and decision to file improperly for bankruptcy to avoid resolution of the Chancery Court claims.

71.    Admitted.

72.    Admitted.

73.    Admitted.

74.    Denied.

75.    Admitted, except Defendants deny the allegations in the first sentence in paragraph 75.

76.    Denied.

77.    Denied.

## COUNT I

78.    Defendants repeat and reallege their answers to paragraphs 1 through 77 as if set forth fully herein.

79.    Denied.

80.    Denied.

81.    Denied.

82.    Denied.

83.    Denied.

## COUNT II

84.    Defendants repeat and reallege their answers to paragraphs 1 through 83 as if set forth fully herein.

85.    Paragraph 85 states a legal conclusion to which no responsive pleading is required.

86.    Denied.

87.    Denied.

88.    Denied.

89.    Denied.

90.    Denied.

91.    Denied, except Defendants admit that Medifacts is purporting to seek damages for the benefit of its creditors and shareholders.

92.    Denied.

COUNT III

93.    Defendants repeat and reallege their allegations in paragraphs 1 though 92 as if set forth fully herein.

94.    Paragraph 94 states a legal conclusion to which no responsive pleading is required.

95.    Denied.

96.    Denied.

97.    Denied.

98.    Denied.

**First Affirmative Defense**

The Complaint fails to state a claim upon which relief can be granted.

**Second Affirmative Defense**

Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of waiver, acquiescence, and estoppel.

**Third Affirmative Defense**

Plaintiff's claims are barred, in whole or in part, by the equitable doctrine of unclean hands.

**Fourth Affirmative Defense**

Plaintiff has suffered no loss or damage for which defendants are responsible.

12

### Fifth Affirmative Defense

Plaintiff has failed to join necessary and/or indispensable parties.

WHEREFORE, Defendants pray that the Court:

A.      Enter judgment in the Defendants' favor;

B.      Determine that the Plaintiff takes nothing by this suit; and

C.      Grant such other and further relief as the Court deems appropriate.

### COUNTERCLAIMS AND THIRD PARTY CLAIMS

Counterclaim and Third-Party Plaintiffs, Sandra S. Garrett Ph.D and Bruce N. Garrett, M.D., for their counterclaim and third-party claims against Medifacts International, Inc., Michael Woehler, Herbert H. Hooper, Eugene D. Hill III, Samuel Barnett, Richard Charpie and Susan Pravda (the "Defendants"), allege as follows:

### NATURE OF ACTION

1.      The Garretts bring this action to remedy Medifacts improper refusal to advance to them their fees and costs in defending the claims brought against them as directors and officers of Medifacts.  In addition, Counterclaim and Third-Party Plaintiffs bring this action against the Defendants because any damage suffered by Medifacts, as alleged in the Complaint, was the direct result of the Defendants' numerous breaches of fiduciary duty in violation of Delaware law in connection with the sale of the CRO Division and the filing of the Chapter 11 Petition by Medifacts on January 28, 2007.

2.      After determining to sell the CRO Division in October 2006, members of the Medifacts Board of Directors encouraged the Garretts to submit an offer to purchase the CRO Division.  Specifically, current and former members of the Board told Sandra Garrett the

13

terms of an offer that would purportedly be acceptable to both the Preferred Shareholders and the Medifacts Board. Dr. Bruce Garrett submitted a proposal in early November 2006 which was neither accepted nor rejected by the Board.

3.      Dr. Bruce Garrett submitted a second offer to purchase the CRO Division, which was ultimately determined by Medifacts financial advisor to be financially superior to the other offers, and the Garretts and the Company entered into a binding letter of intent on December 23, 2006. Immediately after this letter of intent was signed, the Medifacts Board and Preferred Shareholders launched their scheme to extort from Sandra Garrett her valuable rights as the majority common shareholder of the Company. Specifically, the Board and management of Medifacts, at the behest of its preferred shareholders, attempted to use the $2 million deposit paid by the Garretts towards the purchase of the CRO Division as leverage to force Dr. Sandra Garrett to give up valuable rights that she possessed as majority shareholder under the Stockholders Agreement and Investor Agreement. The Defendants refused to act in good faith to consummate the sale of the CRO Division as required by the letter of intent and instead demanded that Sandra Garrett give up these valuable shareholder rights. When the Garretts refused to accede to Medifacts' new and onerous terms, the Defendants refused to close the transaction and refused to return to the Garretts the $2 million deposit.

4.      Despite the fact that the Garretts remained willing to consummate the transaction with Medifacts outlined in the Letter of Intent, which Medifacts financial advisor had determined was financially superior to all other offers, the Board, over Sandra Garrett's objection, determined to accept an inferior offer to purchase the CRO Division from Clinsys.

5.      Left with no other options, the Garretts filed suit in the Delaware Court of Chancery to specifically enforce the terms of their binding letter of intent with the Company and

to enjoin the sale of the CRO Division to Clinsys, or in the alternative, to recover their $2 million deposit. In conjunction with the Complaint, the Garretts also filed a Motion for Expedited Proceedings. Medifacts resisted expedition, but the Court nonetheless scheduled a preliminary injunction hearing for February 12, 2007. Thereafter, the Court cancelled the preliminary injunction hearing and instead scheduled an expedited trial for March 8, 2007. Importantly, the Court of Chancery was willing to resolve the dispute even more promptly, but once again, the date was delayed at the request of Defendants.

6.     Within hours of the setting of the trial date in the Court of Chancery, Defendants initiated a plan to surreptitiously file a bankruptcy petition on behalf of Medifacts to prevent the Court of Chancery from resolving the claims on the merit.

7.     To protect themselves from liability in the Court of Chancery action and without any consideration of the financial ramifications of their actions, the Defendants authorized the filing of a Chapter 11 Petition on Sunday January 28, 2007. The Board of Directors and management of Medifacts performed virtually no investigation as to the possible ramifications of filing a Chapter 11 petition prior to filing.

8.     As a direct result of the Company's filing of a Chapter 11 Petition, the Company and the CRO Division plummeted in value. Clinsys withdrew its offer to the purchase the CRO Division, and ultimately, the only buyer still willing to buy the CRO Division was the Garretts. Thus, by authorizing the filing of a Chapter 11 Petition to shield themselves from liability in the Court of Chancery, Defendants not only destroyed the value of the Company and the CRO Division, but forced the Company to incur hundreds of thousands of dollars in unnecessary legal fees and other expenses. To the extent Medifacts was harmed as alleged in the

Complaint against the Garretts, the Third-Party Defendants are directly responsible and liable for such harm.

## THE PARTIES

9.      Plaintiff Bruce N. Garrett, M.D. was the Chief Medical Officer of Medifacts and owns 138,487 shares of Medifacts commons stock, representing 2.51 percent of the total equity of Medifacts.

10.      Plaintiff Sandra S. Garrett, Ph.D. is the founder of Medifacts and has been a director of the Company since 1985.  Dr. Sandra Garrett owns 2,550,413 shares of Medifacts common stock, which represents 46.16 percent of the total equity of Medifacts.  Together, the Garrets own 67 percent of the outstanding common stock of the Company.

11.      Defendant Michael E. Woehler is the President and Chief Executive Officer of Medifacts International, Inc. and a Director of the Company.

12.      Defendant Herbert H. Hooper is a Director of the Company, who was designated by Ampersand 2001 Limited Partnership ("Ampersand"), one of the Company's Series A preferred stockholders, under the terms of the Stockholders Agreement.

13.      Defendant Eugene D. Hill is a Director of the Company, who was designated by International Life Sciences Fund III (LP1), L.P. ("International"), one of the Company's Series A preferred stockholders, under the Stockholders Agreement.

14.      Defendant Samuel Barnett is a director of the Company, who was recommended to serve on the board by International Life Sciences Fund III (LP1) L.P.

15.      Defendant Susan Pravda was a director of the Company until she resigned from the Board in December of 2006.  Ms. Pravda also served as outside counsel to the Company during all relevant times.

16.    Crossclaim/Counterclaim Defendant Richard Charpie is an observer of the Board and is a principal of Ampersand.

BACKGROUND

17.    Because of the challenges facing the Company, in October of 2006, the Board of Directors of the Medifacts determined that it was in the Company's best interest to sell one of its two major divisions, the CRO Division. The CRO Division of Medifacts specializes in Phase II, III and IV clinical research for the biotech, pharmaceutical and medical device communities.

18.    Shortly thereafter, members of the Medifacts Board began to encourage the Garretts to make an offer for the CRO Division. Indeed, Susan Pravda, then a director of and counsel for the Company, contacted Sandra Garrett and left her a message outlining the terms pursuant to which the other Board members and the preferred shareholders would purportedly be willing to sell the CRO Division to the Dr. Bruce Garrett. Ms. Pravda explained in a voicemail to Dr. Sandra Garrett:

> It's Susan. I spoke with Darrin um He spoke with Herb um then I spoke with Darrin again. And um they would be and I think they spoke to Sam actually so I should put that in order. Um They on behalf of the group and speaking for the majority of the Board um would be interested in potentially aah executing a um sale to you of the CRO business. Um the um suggestion would be that um um given that um obviously they have fiduciary duties to the Company um not to set um a value for this that would be below market that um you should put an offer together and submit it to the Board to purchase the CRO business. Um the basis on which um they would think would make sense to move forward without making obviously commitment until we see your offer would be um if it was done very quickly, um maybe could get completed in its entirety within let's say than 30 days so that the cash burn for Medifacts for that business um stopped um and um because the foreign assets at least have some value aah for example the Phase I Unit and the like um aah some payment whether that be perhaps aah forgiveness of your severance payments which have a

17

probably a di minimus present valuation to you because they're worth $700,000 ordinary income over two years um so you might want to propose that you'll forgive your severance payments in exchange for the CRO business. I don't know how much your severance payments are worth to you but they're probably worth $250,000 or $200,000 to you or something on that present value basis. Um or aah a note a long-term note they would consider or a um aah aah aah aah aah aah some carrying equity interest in the business although that probably isn't the preference of the company but they look to you to make a proposal. And um assuming you made a proposal and the proposal was acceptable, then it certainly makes sense to focus the bankers' attention on other strategical terms for the Company, focusing on the Core Lab's um absent that we obviously as a Company have to have the bankers focus entirely on the business as a whole. Um but um they are absolutely open to this a possibility but I do think Sandi it's something we'd have to get done very quickly. Um so if you want to have a conversation with me or you want me to have a conversation with Steve, I assume Steve will put this together on your behalf since this would be a personal offer or maybe your and Bruce's to have however you might do this. I will be happy to do that and obviously if I talk to you. So give me a call when you get a chance. Bye.

19.    In response their requests, in early November, 2006, Dr. Bruce Garrett made a formal written offer to purchase the CRO Division. This offer was never approved or rejected by the Board.

20.    Around the same time as Dr. Bruce Garrett made his initial offer, the Company retained Crosstree Capital Partners, Inc. ("Crosstree") to serve as its financial advisor and evaluate the Company's CRO Division. Dr. Sandra Garrett recused herself from all board meetings with Crosstree during which the value of the CRO Assets was discussed.

21.    On November 27, 2006, the Board determined that Crosstree should ask a limited group of potential acquirers for an expression of interest in acquiring the CRO Division in a transaction targeted to close on or before January 31, 2007. As a result of this process, Crosstree identified three potential acquirors for the CRO Division: Dr. Bruce Garrett, Clinsys, and Veeda.

22.     On December 15, 2006, Bruce Garrett sent a letter of intent to Shane C. Senior, the Managing Director of Crosstree Capital Partners, Inc., offering to acquire the CRO Division from the Company. The December 15 letter set forth the principal terms and conditions of the Garretts' offer to acquire the CRO Division.

23.     On December 22, 2006, the Board held a meeting to consider the expressions of interest received from the three bidders. At the meeting, the Board determined to adjourn the meeting until December 23, 2006 and to have Crosstree contact Veeda and Dr. Bruce Garrett to determine if they would be willing to improve their offers.

24.     After discussions with the Company's management and their advisors, on December 22, 2006, Dr. Bruce Garrett again wrote to Shane Senior supplementing the terms of the December 15 letter and again proposing to enter into a letter of intent regarding the purchase of the CRO Division. Among other things, the December 22 letter increased the consideration offered by the Garretts for the CRO Division and amended the terms of the December 15 letter to include a clause, at the request of the Company, affirming the Garretts' commitment to engage in discussions regarding the modification of certain rights held by Dr. Sandra Garrett under the Stockholders Agreement and Investor Agreement.

25.     After further negotiation with the Company and its advisors, the Garretts sent two additional letters on December 23, 2006 to Mr. Senior further amending the terms of the their offer. In response to demands by the Company's management, preferred shareholders, and their advisors, the Garretts increased the purchase price of their offer and Dr. Sandra Garrett agreed to make certain amendments to the Stockholders Agreement and Investor Agreement that were sought by the Company's preferred shareholders.

26.     On December 23, 2006, the Medifacts Board met again to discuss the sale of the CRO Division.  At the meeting, Crosstree updated the Board as to the revised offers that had been received and informed the Board that the Garrett offer would provide the greatest total economic value to Medifacts, followed by the Veeda offer and then the Clinsys offer.  Based upon the analysis of Crosstree, the Board determined that the Garrett offer was financially superior to the other offers.  However, purportedly based upon the question of Dr. Bruce Garrett's financial capacity to close the transaction, the Board determined to require Dr. Bruce Garrett to provide a $2.0 million dollar non-refundable deposit on the next business day (December 26, 2006) and to accept the pledge of Dr. Sandra Garrett's shares immediately until replaced by the deposit.  Moreover, the Board determined to require the Garretts to accept their demand for the $2.0 million deposit by 5:00 p.m. on that date, and to the extent the Letter of Intent with Dr. Garrett was not executed by 5:00 p.m. on December 23, 2006, the Board authorized the signing of a letter of intent with Veeda.

27.     Following the December 23 Board meeting, Michael Woehler, the CEO of Medifacts, sent Dr. Bruce Garrett a signed letter via email. Mr. Woehler's December 23 letter specifically incorporated the terms of the December 15 letter as amended by the December 22 letter and two letters of December 23 (taken together, the letters are referred to herein as the "Letter of Intent")

28.     Believing that all of the principal terms of the transaction had been agreed upon and based upon the representation of Mr. Woehler and the Board that the Company would act in good faith to consummate the Transaction promptly, and in all events, before the Closing Date, the Garretts signed the December 23 Woehler letter and wired to the Company the $2.0 million deposit.  Unbeknownst to the Garretts, the Defendants and the Preferred Shareholders

never intended to act in good faith in consummating the Transaction.   Rather, Defendants intended to use the $2.0 million as leverage to compel Dr. Sandra Garrett to give up valuable rights that she had under the Shareholders Agreement and the Investor Agreement, or absent the Garretts' concession, to take the $2.0 million without closing the Transaction.

29.   Almost immediately after execution of the December 23 Woehler letter, the Company refused to provide the Garretts with the most basic financial due diligence necessary to close the Transaction.   In addition, at the urging of the preferred stockholders, the Company's management and directors made improper demands upon the Garretts for Dr. Sandra Garrett to give up valuable common shareholder and governance rights well beyond those outlined in the Letter of Intent.   Furthermore, the Company unreasonably refused to accept a letter of credit in the amount offered by the Garretts to provide commercially reasonable coverage for potential losses the Company could incur if the Garretts defaulted on payments under any leases assumed as part of the transaction.

30.   On December 27, 2006, both the Garretts and their attorneys wrote to Medifacts and its advisor to complain about the lack of cooperation from Medifacts' management and advisor in closing the deal and to request that the closing be put off for a few days to a week to allow the necessary due diligence and memorializing of the transaction to occur.   While Mr. Woehler acknowledged that the Company lacked the personnel to furnish the Garretts with the necessary due diligence because of the holiday season, Defendants nevertheless initially refused to extend the closing date, and then were only willing to extend if the Garretts acceded to material changes to the terms of the Transaction.

31.   Notwithstanding the Defendants' lack of cooperation, on January 1, 2007, the Garretts' attorneys sent the Company and its advisors a set of Transaction documents that

were consistent with the Letter of Intent and could serve as the basis for the closing on January 2, 2007. On the morning of January 2, 2007, the Garretts through their attorney reaffirmed their willingness to close the Transaction on the most recently circulated documents that were fully consistent with the Letter of Intent.

32.    However, on the Closing Date, Medifacts refused to consummate the Transaction despite the fact that the Garretts were prepared to close pursuant to the terms reflected in the Letter of Intent. At 5:06 p.m. on January 2, 2007, Mr. Woehler sent to Dr. Bruce Garrett an email stating that, because the Transaction was not consummated on or before 5:00 p.m., the deposit was forfeited and the Company had no further obligation to the Garretts.

33.    On January 3, 2007, Dr. Bruce Garrett sent Medifacts' CEO a letter, informing him that, although Medifacts had failed to honor its obligations under the Letter of Intent, the Garretts nevertheless remained ready and willing to enter into a deal to acquire the CRO Division.

34.    Medifacts' CEO responded by letter on January 4, 2007, by outlining three new and entirely different sets of terms for an acquisition of the CRO Division and stated that Woehler would recommend to the Board that Medifacts sell the CRO Division to Dr. Bruce Garrett only if Dr. Bruce Garrett agreed to accept one of the three new sets of terms. This letter was nothing more than an improper attempt to renegotiate the terms of the deal that the parties had previously agreed upon in the Letter of Intent by increasing the purchase price or requiring the Garretts to give up their voting rights as common stockholders or give up their common stock entirely. Moreover, the Company refused to return the Garretts $2.0 million unless they agreed to the revised terms.

35.    On January 9, 2006, Dr. Bruce Garrett again informed Medifacts that he considered it to be in breach of the agreement and demanded the return of the Garretts' $2.0 million deposit.

36.    Despite Medifacts' breach of the Letter of Intent and refusal to return the $2.0 million deposit, the Garretts still remained willing to consummate the purchase of the CRO Division.

37.    On January 9, 2007, Medifacts' CEO informed Dr. Bruce Garrett by letter that, because the Garretts insisted on a return of their $2.0 million or transfer the funds into an escrow account as a condition to any further negotiations for the purchase the CRO Division, Medifacts would move forward with other potential buyers.

38.    On January 11, 2007, Medifacts held a special meeting of its board of directors. Members of the Board (absent Dr. Sandra Garrett) purportedly considered the Garrett offer no longer available, despite a communication from two days earlier that expressed clearly a desire to close the transaction by Dr. Bruce Garrett. Although the Clinsys bid had not changed since December 23, 2006 and remained economically inferior to the Garrett bid, over the objection of Sandra Garrett, the board decided to enter into a letter of intent with Clinsys for the sale of the CRO Division. Consistent with Crosstree's original analysis that the Clinsys offer would provide the lowest total economic value to Medifacts, the terms of this letter of intent remained inferior to the terms of the Letter of Intent Medifacts entered into with the Garretts. Even more egregious, the terms of the Clinsys letter of intent prevented the Board from having any further discussions with the Garretts concerning their superior offer.

39.    Left with no other options, the Garretts filed a Verified Complaint in the Delaware Court of Chancery on January 16, 2007 (the "Court of Chancery Action") against

Medifacts, Michael Woehler, Herbert H. Hooper, Eugene D. Hill III, Samuel Barnett, Ampersand 2001 Limited Partnership, and International Life Sciences Fund III (LP1), L.P. to, among other things, enforce their contractual rights under the Investor Agreement and Letter of Intent and to remedy the numerous breaches of fiduciary duties and other wrongful conduct by the Directors and the Preferred Shareholders in violation of Delaware Law. The Court of Chancery action is captioned *Garrett v. Medifacts International, Inc.*, C.A. No. 2673-N.

40.     In conjunction with the Complaint, the Garretts also filed a Motion for Expedited Proceedings (the "Motion to Expedite"). The Defendants initially opposed expedition, but the Court of Chancery nonetheless scheduled a preliminary injunction hearing for February 12, 2007, and asked that the Defendants update the Court as to the status of the Clinsys transaction by Friday, January 26, 2007.

41.     On January 24, 2007, the Garretts and the Defendants asked the Chancery Court to convert the preliminary injunction hearing into an expedited trial in late February or early March so that the Court could decide all of the claims for equitable relief including the request to specifically enforce their rights under their Letter of Intent. Due to the Defendants' counsel's unavailability the week of February 26, the Court of Chancery scheduled a two-day trial beginning on March 8, 2007.

42.     At around 2:45 p.m. on Friday, January 26, 2007—less than four hours after the scheduling conference with the Court of Chancery—Medifacts' CEO, Michael Woehler "Woehler"), sent an email to the Medifacts directors purporting to convene a board meeting for Sunday, January 28, 2007 at 9:00 a.m. "in order to update the Board on the Company's operations and financial position and to discuss strategic and funding options facing the

Copmpany." At this time, Woehler knew of Defendants' plan to file a bankruptcy petition on Sunday, but there was no mention of that fact in his email to the Board.

43.     On January 24, 2007, the Defendants and their counsel had a teleconference during which the filing of a bankruptcy petition was discussed. At this time, counsel for the Defendants had already started the preparation of the bankruptcy filing, although there had been no disclosure to the Board, much less consideration by the Board of whether bankruptcy was advisable.

44.     On January 27, 2007 the Defendants held another conference call to discuss their scheme to file for bankruptcy the next day. Later that day, Dr. Sandra Garrett wrote to Mr. Woehler stating that she was unavailable to participate in a Board meeting on Sunday, but could participate in a board meeting on Monday. As of this point, the Board still had not been told that a pre-emptive bankruptcy filing was under consideration.

45.     Defendants refused to postpone the Board meeting until Monday purportedly out of fear that the Garretts would seek relief from the Court of Chancery to block an improper and unauthorized bankruptcy petition. Rather, certain members of the board convened on Sunday morning and purported to "adjourn" the meeting until 8:00 p.m. on Sunday evening. At the time the directors purported to convene on Sunday morning, the Board had never been informed that the Company was even considering filing for bankruptcy. Rather, it was not until Mr. Woehler sent an email to Dr. Sandra Garrett on Sunday at 9:46 a.m. that he first disclosed that the Company was considering the filing of a bankruptcy petition.

46.     Dr. Sandra Garrett could not be available for a meeting on January 28, 2007. The Directors nevertheless purported to hold a meeting on January 28, 2007, at 8:00 p.m., at which the Directors purported to authorize the filing of a bankruptcy petition on behalf of

Medifacts (the "Petition").  Although never properly authorized under Delaware law and the Medifacts governing documents, on January 28, 2007, the Company filed the Petition with this Court commencing this Chapter 11 Case.

47.    The Petition was nothing more than a scheme by the Board, Management and the Preferred Shareholders to strip the Court of Chancery of jurisdiction to decide the parties' underlying corporate dispute and to forever strip the common shareholders of Medifacts of their rights.  The Medifacts Board and Management rubber-stamped the filing of the Petition without first giving any consideration to the financial ramifications of filing the Petition on the Company and its stockholders.

48.    Indeed, prior to the decision to file the Petition, the Board of Medifacts had not been presented with any updated financial statements for the Company since November 2006.  Further, at the time it considered filing for bankruptcy, the Board did not have a current balance sheet or cash flow projection, much less any pro forma cash flow projection or analysis of SG&A expenses assuming that the CRO Division was sold.  A cash flow forecast prepared at the end of 2006 by Medifacts own financial advisor, Crosstree, indicated that the Company without the CRO Division would have a positive cash position into the indefinite future.  Indeed, neither Crosstree nor any other financial, accounting or restructuring advisor provided any advice to the Medifacts board concerning the need or ramifications of bankruptcy prior to the time the petition was filed.

49.    At the time of the filing of the Petition, Medifacts' debt consisted of approximately $800,000 in unsecured debt and two letters of credit, one for approximately $300,000 (USD) and one for approximately $300,000 euros.  Medifacts had over $5 million in

cash in the bank. According to the Petition, Medifacts would have had a negative cash balance in June 2007 if it was not able to consummate a transaction for the sale of the CRO Division.

50.     The Medifacts Board determined to file for bankruptcy on Sunday, January 28, 2007, solely for the purpose of stripping the Court of Chancery of jurisdiction and preventing that Court from resolving the claims on the merits. The improper bankruptcy filing had immediate and disastrous consequences on the financial condition of Medifacts.

51.     The Garretts moved to dismiss the Petition on January 30, 2007. A hearing on the Garretts' motion to dismiss commenced, but was not completed, on Friday, February 9, 2007. At this hearing, Mr. Woehler testified that: (1) the Defendants in Court of Chancery case prepared the papers for Medifacts' Chapter 11 petition without giving the board of directors notice, much less obtaining approval by the board of directors; (2) Medifacts never performed or hired anyone to perform an analysis of what would happen if the CRO Assets were sold after the Court of Chancery proceeding was scheduled to conclude in early March, 2007; and (3) neither management nor the board of Medifacts received any advice as to the impact of a bankruptcy filing on the Company' financial situation prior to filing.

52.     Also on February 9, the Garretts learned that one of the Company's largest customers decided to terminate its contract solely because the Company had filed the Petition. The loss of this customer was a severe blow to the Company's financial situation. Because the harm caused by the improvidently filed petition, the Garretts withdrew their motion to dismiss the bankruptcy, despite the fact that the bankruptcy was not properly filed.

53.     Thereafter, Medifacts conducted a full auction of the CRO Division.

54.     At the auction on March 7, 2007, the Garretts were the only bidder for the entire CRO Division. Apparently, the improvidently filed Petition and the resulting damage to

the Company had dissuaded the other potential bidders (i.e. Clinsys and Veeda) from making an offer. The Garretts purchased the CRO Division for $2.15 million, $2 million of which was the Garretts' deposit. According to the order authorizing the sale, the $2.15 million "(i) is fair and reasonable, (ii) is the highest or otherwise best offer for the CRO Assets, and (iii) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative, including the shut down of the CRO division.

55.     According to the order authorizing the sale, the sale of the CRO Division to the Garrets "was negotiated, proposed and entered into by the Debtor and the [Garretts] without collusion, in good faith, and from arm's-length bargaining positions." Although the Garretts were technically "insiders" as that term is defined in the Bankruptcy Code, "the record is clear that (i) neither the [Garretts] nor [their] principals were involved with any decision by the Debtor to sell the CRO Assets in connection with the process and procedures approved by [the] Court, (ii) all negotiations between the Debtor and [the Garretts] were conducted at arms length and with the involvement of counsel, and (iii) the [Garretts] [were] provided information by the Debtor relating to the CRO Assets equal in all respects to the information provided to all other bidders."

56.     In approving the sale of the CRO Division, the Court held that the "[a]pproval of the Agreement and consummation of the Sale at this time are in the best interests of the Debtor, its creditors, its estate, and other parties in interest." The Court furthermore found that "[t]he Debtor has demonstrated both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the Sale pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, absent the Sale the value of the CRO Assets will be harmed."

57.     In an effort draw attention away from their own blatant breaches of fiduciary duty in connection with the filing of the Petition, the Defendants filed the Complaint on behalf of Medifacts in this adversary proceeding on April 19, 2007

## COUNT I – Breach of Fiduciary Duty

58.     The Garretts repeat and reallege the allegations contained in paragraphs 1 through 58.

59.     The directors of Medifacts owed uncompromising fiduciary duties of care and loyalty to the Company and its common stockholders under Delaware law.  These fiduciary duties required the Director Defendants to maximize the value of the CRO Division and Medifacts for the Medifacts shareholders and to refrain for placing their own self-interest and that of the preferred shareholders above the Company and its common shareholders.

60.     At the behest of the preferred stockholders, the Director Defendants breached their fiduciary duties by placing the interests of the preferred shareholders to have Dr. S. Garrett give up her valuable shareholder and governance rights ahead of the interests of the Company and its common shareholders.

61.     The Director Defendants further breached their fiduciary duties by filing the Petition to protect themselves from the resolution of the Court of Chancery action without first considering the devastating financial ramifications to the Company.  As a result of the filing of the Petition, the Company's value plummeted (including the value of the CRO Division) and the Company lost at least one major client.

62.     In the end, as a result of the breaches of fiduciary duty by the Medifacts Board and management, the CRO Division was sold for less than could have been obtained if

Defendants had acted in good faith and consummated the transaction with the Garretts as outlined in the Letter of Intent.

63.    Moreover, through their bad faith actions and breaches of fiduciary duty, Defendants have caused Medifacts to incur substantial and unnecessary fees and costs.

64.    Thus, to the extent that Medifacts has been damaged as alleged in the Complaint, Defendants, not the Garretts, are liable to Medifacts and its shareholders for their breaches of fiduciary duty and self-serving actions.

### COUNT II – Advancement

65.    Pursuant to Article V of the Bylaws of the company and section 145 of Delaware General Corporation Law, Dr. Sandra Garrett and Dr. Bruce Garrett are entitled to indemnification and advancement of fees and expenses incurred in the defense of this adversary proceeding.

66.    Dr. Sandra Garrett made a request for advancement in late April, 2007.  In the request, Dr. Sandra Garrett provided the Company with an undertaking to repay all amounts advanced if it shall ultimately be determined pursuant to Article SEVENTH of the Corporation's Amended and Restated Certificate of Incorporation, Article V of the Corporations Bylaws and Delaware law that she is not entitled to be indemnified against such expenses.

67.    Dr. Bruce Garrett is willing to provide the Company with an undertaking to repay all amounts advanced if it shall ultimately be determined pursuant to Article SEVENTH of the Corporation's Amended and Restated Certificate of Incorporation, Article V of the Corporations Bylaws and Delaware law that he is not entitled to be indemnified against such expenses.

68.     To date, the Company has refused to advance the fees and expenses incurred by Dr. Sandra Garrett and Dr. Bruce Garrett in connection with the defense of this action.

69.     Dr. Sandra Garret and Dr. Bruce Garrett are, therefore, entitled to an Order requiring the Company to advance all fees incurred in connection with the defense of this adversary proceeding.

WHEREFORE, Defendants/Counter/Third-Party Plaintiffs hereby request the entry of an order:

A.      Declaring that the Third-Party Defendants breached their fiduciary duties to the Company and its stockholders;

B.      To the extent Medifacts has been damaged as alleged in the Complaint, awarding compensatory damages against Third-Party Defendants, in an amount to be determined at trial, together with pre-judgment and post-judgment interest, arising from their breaches and conduct;

C.      Requiring the Company to advance to Dr. Sandra Garrett and Dr. Bruce Garrett all fees and expenses incurred in defending this adversary proceeding;

D.      Awarding Defendants/Counter/Third-Party Plaintiffs their costs and expenses, including reasonable attorneys' fees and experts' fees; and

      E.      Granting Defendants/Counter/Third-Party Plaintiffs such other and further

relief as the Court may deem just and proper.

Dated: Wilmington, Delaware       MORRIS, NICHOLS, ARSHT & TUNNELL LLP
       July 5, 2007

_____
Robert J. Dehney (No. 3578)
David J. Teklits (No. 3221)
Kevin M. Coen (No. 4775)
1201 Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:   (302) 351-9229
Fax:   (302) 658-3989

SAUL EWING LLP

*/s/ Norman L. Pernick*
_____
Norman L. Pernick (#2290)
222 Delaware Avenue
Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6824
Fax: (302) 421-5865

Counsel for Drs. Bruce N. Garrett, M.D., and Sandra S. Garrett, Ph.D.

908816

32